CRIPPLED CHILDREN'S HOSPITAL SCHOOL and
JOSEPH M. BEARMAN, Appellees, v. NINA
COMATSOS, Appellant.—418 S.W.(2d) 432.

Western Section. April 22, 1966.

Rehearing Denied May 27, 1966.

Certiorari Denied by Supreme Court September 19, 1966.

Thomas A. Buford, Memphis, for appellant.

Lovick P. Miles, Jr., Caruthers Ewing, Memphis, for appellees.

CARNEY, J. This is another chapter in the story of the protracted litigation over the estate of John George

Comatsos. See Crippled Children's Hospital School and Joseph Bearman et al. v. Nina Comatsos, 48 Tenn.App. 617, 349 S.W.2d 178, and Bearman v. Comatsos, 215 Tenn. 231, 385 S.W.2d 91.

Mr. Comatsos died on September 28, 1958, while on an extended visit to his native Greece. He was a naturalized citizen of the United States. A resident of Memphis, Tennessee, for many years, he had accumulated property in Greece and Memphis the value of which is roughly estimated at $100,000.

Mr. Comatsos made regular visits to Greece and in 1947, while visiting in Greece, Mr. Comatsos married the present appellant, Mrs. Nina Comatsos. He was 58 years of age and she was 25 years of age. She has a son by a former marriage. She and Mr. Comatsos had no children. Mr. Comatsos had been a boyhood friend of her mother.

After their marriage in 1947 Mrs. Comatsos came to Memphis, Tennessee, where she lived with. Mr. Comatsos for a short time. She was not satisfied to live in America and returned to Greece to make her home. She is and has and at all times been a non-resident of the United States and a citizen and resident of the country of Greece. At the time of his death Mr. Comatsos was 69 years of age and his widow, Mrs. Comatsos, was 36 years of age.

Before Mr. Comatsos left for his last visit to Greece in September, 1956, he had his will drawn by his attorney and longtime friend, Hon. Joe Bearman, of the Memphis Bar. Under the terms of this will he left one-third of all his property to the appellant, his wife Mrs. Comatsos, and the other two-thirds he devised mostly to charities in Memphis, Tennessee, and in Mytilene, Greece, along with legacies to some friends, relatives and associates

including Mr. Bearman, who was to receive $1,000. Reference is made to the opinion of this Court in Crippled Children's Hospital School and Joseph Bearman et al. v. Nina Comatsos, 48 Tenn.App. 617, supra, for an extended list of the beneficiaries under the Bearman will.

On November 23, 1957, while still in Greece Mr. Comatsos executed a second will generally referred to as the Greek will and he also executed a written document purporting to revoke the Memphis or Bearman will. Under the Greek will Mrs. Comatsos is the sole beneficiary of all the property of Mr. Comatsos. Our Tennessee Supreme Court, in an opinion by Mr. Chief Justice Burnett of date December 11, 1964, in the case of Bearman v. Comatsos, 215 Tenn. 231, 385 S.W.2d 91, upheld and affirmed a judgment of the Circuit Court of Shelby County, Tennessee, sustaining the validity of the Memphis or Bearman will and disallowing the probate of the Greek will.

This appeal does not involve the legality of the Memphis will nor Mrs. Comatsos' rights thereunder. This litigation concerns the legal title to two parcels of commercial real estate located in Memphis, Tennessee, formerly owned by Mr. Comatsos. They are now valued at approximately $65,000. Mrs. Comatsos claims full fee simple title by virtue of two deeds executed by Mr. Comatsos while in Greece on July 1, 1958, in her favor. The deeds were acknowledged by Mr. Comatsos before the American Consul in Greece on July 22, 1958, but were not delivered to the Register of Shelby County, Tennessee, for recording until October 8, 1958, after Mr. Comatsos had died on September 28, 1958.

It will be remembered that the Crippled Children's Hospital School and Joseph Bearman, legatees and bene-

ficiaries under the Memphis or Bearman will of Mr. Comatsos, had first filed suit in the Chancery Court of Shelby County in 1958 shortly after the death of Mr. Comatsos to set aside the two deeds as having been obtained by Mrs. Comatsos under fraud, undue influence and duress.

Chancellor Frazer recused himself because Mrs. Frazer was an officer of the School. Retired Circuit Judge Harry Adams was designated by the Supreme Court to hear the cause. The Chancery Court granted the relief, set aside the deeds and divested title out of Mrs. Comatsos.

This Court reversed because the Memphis or Bearman will had not been finally admitted to probate in Shelby County, Tennessee, and the original complainants, Crippled Children's Hospital School and Joseph Bearman, as legatees, were not entitled to contest the deeds executed by Mr. Comatsos. The suit was not dismissed but held in abeyance pending the outcome of the proceedings to probate the Memphis or Bearman will. A receiver was appointed to collect the rents from the realty and Mrs. Comatsos was placed under injunction from encumbering or disposing of the two parcels of land. Shortly after our Tennessee Supreme Court on December 11, 1964, upheld the Memphis or Bearman will the original complainants, Crippled Children's Hospital School and Joseph Bearman, Executor et al. on January 15, 1965, filed an amended and supplemental bill in the cause in Chancery Court seeking to have the two deeds under which Mrs. Comatsos claims title to the two parcels of commercial real estate set aside.

On April 30, 1965, Chancellor Designate Adams entered an interlocutory order nunc pro tunc for April 22, 1965,

adjudging the two deeds under which Nina Comatsos claimed title to have been procured from her husband, John George Comatsos, by fraud, undue influence and coercion. He set aside the deeds, divested title out of the defendant, and vested title in Joseph M. Bearman, Executor of the estate of John George Comatsos.

The decree of April 22, 1965, recited in part as follows:

"This cause came on to be heard on April 22, 1965, upon the motion for a final decree on the pro confesso heretofore taken on the 7th day of April, 1965, upon notice of the motion to the defendant, Nina Comatsos, upon a setting of the case on the Ten-Day Rule Docket, upon the original bill, upon the intervening petition of Joseph M. Bearman, upon the amended and supplemental bill filed by Crippled Childrens Hospital School and Joseph M. Bearman, and upon the entire record, and the Court is of the opinion that upon all of the same there is sufficient (proof) on which to base a ruling for the relief prayed for and, therefore, grants the motion for a final decree on pro confesso.

"Prior to a hearing on all the foregoing, the defendant, Nina Comatsos, in open Court, made an oral motion for a continuance of this matter for a 30-day period in order to enable her to secure counsel, and the Court, being of the opinion that such motion for additional time is not well taken, denied said motion."

On May 3, 1965, Mrs. Comatsos, acting by and through her present solicitor, Mr. Thomas Buford, filed a petition to set aside the pro confesso of date April 7, 1965, and the decree of date April 22, 1965, and prayed to be allowed to file an answer. She tendered a sworn answer denying all of the allegations of the original bill.

On May 13, 1965, the Chancellor entered an order overruling the petition to set aside the pro confesso of date April 7, 1965, and the interlocutory decree of date April 22, 1965. However, the order of date May 13, 1965, expressly recognized the fact that all of the matters in controversy had not been adjudicated by the decree of April 22, 1965, and allowed solicitors to file briefs preparatory to a final decree adjudicating all matters in controversy and extending the time within which the appellant, Mrs. Nina Comatsos, might appeal. On June 21, 1965, the Chancellor entered a final decree which adjudicated all matters in controversy in the litigation below.

Upon this appeal Mrs. Comatsos has filed a number of assignments of error but they raise substantially only two questions: (1) That the Chancellor erred in failing to set aside the pro confesso of date April 7, 1965, and refusing to permit her to file an answer, and (2) that regardless of the entrance of the pro confesso the Chancellor erred in setting aside the two deeds under which she claimed title to said property.

Upon the argument in this Court solicitor for Mrs. Comatsos, in answer to questions by the Court, stated that if the pro confesso had been set aside he knew of no evidence which Mrs. Comatsos could have presented in addition to the evidence which she presented in the trial on the will contest case. The evidence heard in the will contest case is in the record of this appeal and was considered by the Chancellor Designate, Adams, below. The evidence heard in the will contest case in Circuit Court was filed in this case in Chancery Court pursuant to a consent order by the Chancellor of date May 27, 1960.

Before considering these assignments of error it is proper, we think, to give some history of this long and vexatious litigation:

The original bill was filed on December 11, 1958, by the Crippled Children's Hospital School against Mrs. Comatsos seeking to set aside the two deeds as having been fraudulently obtained. Joseph M. Bearman as executor and beneficiary under the Memphis will filed an intervening petition on March 4, 1959.

On April 2, 1959, judgment pro confesso was entered against Mrs. Comatsos.

On September 28, 1959, Mr. Charles H. O'Brien, attorney for Mrs. Comatsos, filed a petition to set aside the pro confesso.

On October 19, 1959, Chancellor Designate Adams denied the petition to set aside the pro confesso.

On November 20, 1959, the Chancellor Designate entered a final decree on the pro confesso divesting title out of Mrs. Comatsos and setting aside the two deeds.

On June 30, 1960, this Court, in an opinion published in 48 Tenn.App. 617, 349 S.W.2d 178, reversed the action of the Chancellor as premature because the complainant, Crippled Children's Hospital School, had standing only as beneficiary under the Bearman or Memphis will and that said Bearman will had not as yet been admitted to probate.

On December 11, 1964, our Tennessee Supreme Court in Bearman v. Comatsos, 215 Tenn. 231, 385 S.W.2d 91, confirmed the legality of the Bearman will.

On January 15, 1965, the complainants filed an amended and supplemental bill which was served together with

process on the defendant, Nina Comatsos, on January 20, 1965, requiring her to answer under oath by February 1, 1965.

On January 29, 1965, Mrs. Comatsos filed a written statement in the cause in which she accused her attorney, Mr. O'Brien, of being disloyal to her and her interests and stating that she had been unsuccessful in getting him to withdraw from the case.

On January 30, 1965, Mrs. Comatsos filed in her own handwriting in the Greek language an unsworn answer to the amended and supplemental bill.

After motion to strike by the complainants, the defendant, Nina Comatsos, filed on February 15, 1965, a typewritten copy of her answer. It was sworn to by her before Hon. Harry M. Adams, Chancellor Designate. His Honor the Chancellor Designate ordered stricken the typewritten answer of date February 15, 1965, upon motion of complainants that it was not responsive to the allegations of the amended and supplemental bill.

Mrs. Comatsos had already filed a letter dated February 12, 1965, discharging her attorneys, R. L. Pearson and Charles H. O'Brien, and they had been permitted to withdraw from the case. She asked the Court for 60 days in which to secure another attorney and file an answer. After discussion, His Honor the Chancellor gave Mrs. Comatsos to and inclusive of March 15, 1965, in which to secure another attorney and file a good and sufficient answer.

Mrs. Comatsos was present upon the hearing and fully understood the instructions of the Chancellor that she had through March 15, 1965, in which to file a legally sufficient answer and that upon failure to do so an order

pro confesso would be taken and entered against her. On March 13, 1965, Mrs. Comatsos appeared in open court and made application for an additional thirty days in which to file her answer which was due on Monday, March 15.

Honorable Walter Buford, an attorney of Memphis, Tennessee, (not her present attorney), testified that he had been approached for employment by Mrs. Comatsos on Wednesday, March 10, 1965, and that he had drawn up a contract of employment for Mrs. Comatsos to sign but she wanted to submit it to her advisers in Greece. The Chancellor refused to grant the extension of time except he stated that if Mrs. Comatsos would employ Mr. Buford that day, then he would grant an additional ten days within which to prepare and file an answer.

The Court further ordered as follows:

"The Court is of the opinion that the past history of this law suit is such that the Court is entitled to insist that Mrs. Nina Comatsos enter into a firm contract of employment and that this Court not be dealt with piece-meal; and the Court is of the further opinion, under the circumstances, it should insist that Mrs. Nina Comatsos enter into a firm contract with her attorneys and that her answer be filed on or before March 23, 1965; * * *"

On March 22, 1965, Mrs. Comatsos telephoned Chancellor Designate Adams and advised him that she wanted to make a motion for additional time in which to file an answer. Thereupon a hearing was set and held at 11:00 A.M. March 22, 1965, with the Honorable Caruthers Ewing representing the complainants and Mrs. Comatsos representing herself. Mrs. Comatsos explained that her

brother in Greece had written her that on April 15, 1965, her attorney from Athens, Greece, one Doukas Kalogeru, would be at the Greek Embassy in Washington, D. C., and would be available to help Mrs. Comatsos employ some attorney in Tennessee outside Shelby County.

Mrs. Comatsos admitted that since her last hearing she had discharged attorney Georgoulis of Chicago and that she was no longer being represented or advised by an attorney from New York who had formerly represented her and admitted that she was not following his advice. Mrs. Comatsos asked for the allowance of $500.00 to enable her to go to Chicago and discuss with the Greek Consul there her legal affairs. The Chancellor refused this request but he did make an order for $150.00 to be paid out of the funds impounded in court to any attorney whom Mrs. Comatsos might retain and who would appear in court and state that he had been employed under a firm contract to represent Mrs. Comatsos' interest to a conclusion. Thereupon the court decreed as follows:

"1. That the Court will allow Nina Comatsos to and inclusive of April 6, 1965, to sign a firm contract with a lawyer and to file a proper answer;

"2. That in the absence of something unforeseen and which commands a further delay, this will be the final allotment of additional time for Nina Comatsos to employ counsel by a firm contract whereby he agrees to handle this matter to a conclusion, and the final allotment of additional time in which to file an answer; and

"3. That in the absence of any further Orders of this Court, a pro confesso may be taken against Nina Comatsos on the amended and supplemental bill on April 7, 1965, unless she has employed counsel by such firm con-

tract, as stated, and has filed her answer to the amended and supplemental bill.

"To all of the foregoing action Nina Comatsos reserves exceptions."

On April 7, 1965, the judgment pro confesso was entered against Mrs. Comatsos.

Assignment of error No. II insists that His Honor the Chancellor erred in granting the complainants' motion to strike the defendant's answer filed pro se; that is, the typewritten answer filed by the defendant on February 15, 1965, and sworn to before the Chancellor.

An answer under oath is both a pleading and a deposition and it must admit or deny every material allegation in the bill and must set forth fully and frankly the details of particular matters called for by the bill. Gibson's Suits in Chancery, 5th Edition, Sections 370, 371, 372, 373, 374, and 383. After notice of the filing of an answer the complainant has 20 days within which to except to the answer if he deems the same insufficient or defective. T.C.A. Section 21-701.

These exceptions must be filed before the Clerk & Master and action of the Clerk & Master had thereon before they can be presented to the Chancellor. The Chancellor can consider exceptions to an answer only upon appeal from the decision and action of the Clerk & Master. Wood v. McFerrin, 1893, 61 Tenn. 493.

We copy the defendant's answer pro se as follows:

"ANSWER IN THE AMENDMENT AND SUPPLE-MENTAL BILL, FILED JAN. 15, 1965

To the Honorable Chancellors of the Chancery Court of Shelby County, Tennessee:

Come now Nina Comatsos to answer personally, in order to be on time February 1st, 1965, Now I kindly ask of the Hon. Judges to forgive my legal incompetences and to take into consideration that, the attorneys-at-law O'Brien & Pearson, who had the duty to answer accordingly and on time, they denied to do so, by stating that 'we do not have the time to do so.'

After this denial, I went to the Local Bar Association of the Attorneys-at-Law in order to protest the above denial. Thus the Bar recommended me to write down all my complaints, which I already filed today, through which I seek the resignation of my Attorneys O'Brien & Pearson.

I sent two clergymen to talk to them for this, & they also refused to them this resignation.

Today I went with my daughter-in-law and I asked once again their resignation and both of them refused to do so.

Mr. O'Brien called the Hon. Judge Mr. Adams and he asked for an extention (sic) in order to answer in due time,—till another Attorney will be found, and the Judge agreed for this through the telephone, and he would sign this special request in a legal document after he already spoke with Mr. Bearman, an Attorney-at-Law which was accepted on both sides.

Therefore, I felt the necessity to submit in this Hon. Court this present reply, in order to be on time, i. e. February 1st, 1965, till I will be able to answer properly and legally through my new legal advisor in the

very near future, whereby I will submit all evidences & data on my account.

1. The defendant now, myself, I protest the jurisdiction of Mr. Joe Bearman,—the so called—executor of the first Will & Testament which was badly validated (May 14, 1956), and I am planning to go to the United States SUPREME COURT to ask the cancellation of the above Will & Testament, whereby I will oppose the false claims of my opponents that my husband when he made the last Will & Testament, Nov. 23, 1957 that he was a U. S. resident though I am proving that he was a Greek resident subject & citizen & he was in Greece at that time & date.

Having in my hands official Greek Government documents, I will attach them to the special & legal answer, whereby I will prove that my husband was residing in the Island of Myteline since December 1947 till September 28th, 1958 the day when he passed away. Also, another proof that he never did loose his Greek citizenship.

2. In another application in the Hon. Courts of U. S. A. & Greece, I am planning to prove that Mr. Joe Bearman made an abuse as a legal councellor (sic) of my husband & he fought the interests of my family for his own benefits & ever since he has created a conspiracy with his associates against my interests for a period of six years; conspiracy with my attorneys and my enemies; enemies are those who appointed my advisors.

3. I protest all the way for the false accusations which do not have any stability whatsoever, that I forced my husband to write me a new will & Testament, and sell me his property & I am proving the

moral & legal aspects of the above stated false accusations.

4. I desire to state that all those who were mentioned as beneficiaries in the first Will & Testament (in Greece), all of them resigned from it. There is only the Philanthropic Institutions of Memphis, which amounts to $6,250.00 I have Bank Checks of my husband which cover the above amount, & this money must go to me.

As far as the Titles of my properties, I am proving that they rightfully belong to me; because this is Justice; and this is the doctrine of the Greatest Nation & protector of the world; the United States of America, whereby Justice is rendered to those who rightfully deserve it. With reservation to my legal rights,

Respectfully submitted,
Mrs. Nina J. Comatsos, widow

February 13, 1965
Subscribed & sworn to before
me on above date.
 Harry M. Adams
 Chancellor Designate''

Solicitors for complainant filed no exceptions to the answer but moved to strike on the grounds that it was in no way responsive to the amended and supplemental bill. The Court agreed that the motion should be granted under the statement in Gibson's Suits in Chancery, Section 376, page 429, and ordered the typewritten answer of February 13, 1965, stricken on the ground that it made no issue and did not meet the material averments and charges contained in the amended and supplemental bill.

The typewritten answer filed by Mrs. Comatsos pro se was inartificially drawn. Admittedly it was not fully

responsive to the allegations in the amended and supplemental bill and contained a considerable amount of irrelevant matter. However, there was a general denial of the allegations of fraud, undue influence and coersion on the part of Mrs. Comatsos against her husband, John George Comtsos, and a general denial that the complainants were entitled to any relief under their amended and supplemental bill and an averment that the deeds were voluntarily executed by Mr. Comatsos in her favor. There were no exceptions to the answer filed by the complainants as required by T.C.A. Section 21-701. The answer filed by Mrs. Comatsos raised an issue of fact as to the grounds on which the complainants sought to set aside the two deeds.

We must respectfully disagree with His Honor the Chancellor Designate in his interpretation of Section 376 of Gibson's Suits in Chancery. It is only when an answer makes no issue at all that it may be stricken from the files by the Chancellor. We are cited to no authority which holds that His Honor the Chancellor may upon motion strike an answer for insufficiency where there have been no exceptions filed to the answer before the Clerk & Master and appeal taken from the Clerk & Master's ruling thereon to the Chancellor.

In Harris v. Naff, 210 Tenn. 433, 360 S.W.2d 6, our Tennessee Supreme Court reversed this Court and held that the Chancery Court could not strike an unsworn answer for insufficiency where no exceptions had been filed as provided by Section 21-701. The unsworn answer contained only a general denial of liability or plea of nil debet. The clear implication of Harris vs. Naff is that a sworn answer also may not be stricken for insufficiency unless exceptions are filed under Section 21-701.

■ We hold that assignment of error No. II is well taken that His Honor the Chancellor was in error in striking the typewritten answer filed pro se by Mrs. Comatsos.

Assignment of error No. VI insists that the Court below erred in failing to set aside the pro confesso before final judgment. T.C.A. Section 21-506 is as follows:

"21-506. Setting aside decree.—A defendant, who has been served with process, may, at any time before final decree, on good cause shown, obtain from the chancellor, or clerk and master, an order setting aside the decree pro confesso, upon filing a full and sufficient answer and the payment of costs."

■ The action of the Chancellor in overruling a motion to set aside an order pro confesso will not be disturbed unless it affirmatively appears that there was an abuse of discretion in overruling of the motion. Columbia Production Credit Association v. Polk, 1954, 197 Tenn. 591, 276 S.W.2d 737, citing Reese v. Hake, 184 Tenn. 423, 199 S.W.2d 569, and Gamble v. Waters, 197 Tenn. 470, 274 S.W.2d 3.

Except for the fact that we have already held His Honor the Chancellor in error in striking the typewritten answer pro se filed by Mrs. Comatsos, this Court would have no hesitancy in holding that His Honor the Chancellor Designate did not abuse his discretion in refusing to set aside the pro confesso entered against Mrs. Comatsos.

This entire lengthy record presents a most unfavorable picture of Mrs. Comatsos. She has shown utter disrespect for the courts of our land. Mrs. Comatsos called upon Chancellor Frazer in the office of the Clerk & Master and

she created such a disturbance that it was necessary for Chancellor Frazer to have her escorted from the courthouse by a deputy sheriff. She accused Judge Greenfield Q. Polk, who presided over the will contest, of being prejudiced and asked him to withdraw without any reasonable cause for such accusations. She asked Judge Harry Adams to recuse himself because he was "a retired irresponsible Judge." She has had approximately twenty lawyers to advise her and has refused to follow the advice of any of them. Her attorney, Sen. Charles O'Brien, represented her longer than any other lawyer and made many concessions on his fees in order that she might make withdrawals from the funds in the Registry of the court on which to live yet apparently she did not appreciate his effort, went to his office, became embroiled in a controversy and finally tore his shirt from his back in a fit of anger. She has slandered nearly all of her lawyers by insisting in substance that they were conspiring to deprive her of proper legal representation. She testified that Mr. Comatsos referred to his longtime friend, Mr. Bearman, as a "goddamned lawyer and a snake" and that he continued to call him that throughout his last visit to Greece up until the time of his death.

When Mr. Comatsos was being treated in the clinic of Dr. Daglis in September, 1957, she accused the nurses of slipping in at night and giving Mr. Comatsos morphine and accused Dr. Daglis of giving Mr. Comatsos pentothal (truth serum) in an effort to extort money from him. She created such a disturbance in the clinic of Dr. Daglis that he had to call in relatives and friends as well as the police. She threw pieces of medical equipment across the room, she smashed a window in Dr. Daglis' office and also broke the windshield of his car. After Mr. Comatsos

was released from the Daglis Clinic she persuaded Mr. Comatsos to file suit against Dr. Daglis claiming that he had been extorted of some $30,000 to $40,000. Before trial Mr. Comatsos broke down and admitted to Dr. Daglis and made affidavits before his longtime friend, Mr. Papanicolas, an attorney and Notary Public of Mytilene Greece, that the charges were false and that his wife had made him bring such charge. Mrs. Comatsos claimed that she purchased the olive grove located in Greece and the real estate located in Memphis from Mr. Comatsos and that she paid him in gold; that she had lots of money saved up but gave no explanation of what happened to the money after she paid it to Mr. Comatsos. She told the American Consul, Mr. Cyphers, that she only married Mr. Comatsos for his money.

Since being in this country she has drawn over $10,000 from funds in this Court and has paid her attorneys very little though they have been allowed attorneys' fees of $10,000 which is charged against her interest in the estate. She claimed to be without funds and wanted to return to Greece to assist in obtaining evidence in her behalf and yet when funds were made available she refused to accept them. She has made no reasonable explanation of what happened to all the funds which Mr. Comatsos drew (amounting to several thousand dollars) out of the Memphis banks before his death nor has she made any reasonable explanation of the whereabouts of the gold which she said she paid him for the olive grove; nor of the $57,000 she allegedly paid him for the Memphis property. She feigned ignorance and followed a studied course of delay.

When this appeal was heard she appeared in open court and attempted to dismiss her most recent attorney, the

Honorable Thomas A. Buford, of Memphis, and sought a further delay. Upon being told by the Court that the cause would be heard that day and no further delay would be permitted by this Court, she then agreed that her attorney, Mr. Buford, might continue and argue the appeal for her. We do not feel that we could put any credence in any of her testimony.

■■ However, under our jurisprudence every person, no matter how low in integrity, is entitled to his day in Court. Having held that His Honor the Chancellor was in error in striking the typewritten answer pro se filed by Mrs. Comatsos, we must necessarily hold that he was in error in failing to set aside the pro confesso entered against her after the answer was stricken. In Chancery Court every allegation of fact not admitted must be proven. Bank of Jamaica v. Jefferson, 92 Tenn. 537, 22 S.W. 211, and Harris v. Naff, 310 Tenn. 433, 360 S.W.2d 6. Assignment of Error No. VI is sustained.

However, it is not necessary to reverse for new trial because the appellant, by her attorney in open court, stated that if the pro confesso had been set aside she did not have any evidence to submit in addition to the evidence presented in the will contest case. By order of May 27, 1960, this evidence was made evidence in the present litigation, the Chancellor Designate considered it and it is in this record on appeal. Therefore, we consider this case de novo on the evidence which was before the Chancellor accompanied by a presumption of correctness of the decree of the court below. T.C.A. Section 27-303.

The record on this appeal is voluminous, some 11 volumes and over 1400 pages. Resumes of the contents of the record filed by solicitors of the parties have been most helpful.

Mr. Joseph M. Bearman, a highly respected member of the Memphis Bar for over 46 years, had known and represented Mr. Comatsos for about 30 years; Mr. Comatsos spent many, many hours in his office discussing with him the matter of his will; Mr. Comatsos had discussed divorce from his wife who refused to live in Memphis with him. Mr. Bearman recommended that his longtime friend, Mr. Voyadjis, an attorney in Greece, should bring the suit. Mr. Comatsos was very careful to provide in his will that Mrs. Comatsos should get one-third of his estate free of taxes, attorneys' fees, etc. After getting the will drawn as he wished, Mr. Comatsos, in September, 1956, left for Greece. He left a bank account of several thousand dollars, some stocks and bonds. Monthly rentals from the real estate were deposited in a Memphis bank to the credit of Mr. Comatsos.

In July, 1957, Mr. Comatsos' bank account began to run short of money; checks began to come in fast and furious in amounts of $500.00 or more. Mr. Bearman, at the request of Mr. Comatsos, sold stocks and obtained funds in the amount of over $3,000 which he sent directly to Mr. Comatsos during the period from July through September, 1957. Letters from Mr. Comatsos to Mr. Bearman were unclear and confusing. Mr. Bearman received a trans-oceanic phone call from Mr. Comatsos in which the conversation was very unsatisfactory. Mr. Bearman became alarmed over the physical well being of Mr. Comatsos and became apprehensive that Mrs. Comatsos was physically mistreating him. He wrote the American Consul in Greece to look into the situation. He also wrote Mr. Anthony Voyadjis of Mytilene, Greece, a longtime friend and attorney, to check on Mr. Comatsos. In October, 1957, he received a letter from Mr. Comatsos telling him to

cancel his will of September, 1956, and to sell his real estate and to send him the money. On January 12, 1958, he received a letter from Mr. Comatsos stating that he had sold his real estate to his wife.

While there is some proof to the contrary, the preponderance of the evidence is that the health of Mr. Comatsos deteriorated rapidly after he reached Greece. George Panagiotis Triantaphylou, aged 65, testified that he was the owner of the house which Mr. and Mrs. Comatsos rented and that they lived on the upper floor while he occupied the downstairs; that Mrs. Comatsos brought to him the Memphis or Bearman will written in English which she asked him to read. He explained to her that she only received one-third of his estate and that the remaining two-thirds he left for Philanthropic Institutions in America and in Greece; that Mrs. Comatsos, after the reading of the will became angry. Mr. and Mrs. Comatsos argued nearly every day, particularly about property; that after three months of argument Mr. Comatsos "became a lost lamb, frightened and terror ridden, and seemingly under the complete domination of his wife;" that he once heard John Comatsos begging his wife to open the door and let him out when she had locked him inside; that often-times Comatsos would leave home with a suitcase in his hand and go to the hotel and possibly other places and then later he would come back or his wife would go out and get him and bring him back.

On October 3, 1956, Mr. Comatsos executed a deed to his olive grove to Mrs. Comatsos at a stated price of 80,000 drachmas (about $3,000 in American money) which several witnesses estimated to have been worth about 1,000,000 drachmas. Mr. Voyadjis, attorney and longtime friend of Mr. Comatsos, refused to execute the transac-

tion and so did Mr. Papanicolas, another longtime friend and attorney, refuse to execute the transaction. The deed or bill of sale was finally written by Notaries Public Antonakes and Samarides.

About this time in October, 1956, Mr. Comatsos checked into the clinic of Dr. Leftherois John Daglis, physician aged 41, a specialized pathologist having studied at Nowaco, Germany, for eight years and also having studied in Switzerland. Dr. Daglis spoke German, French, English, as well as Greek. He had known Mr. and Mrs. Comatsos since 1951. Mrs. Comatsos brought Mr. Comatsos to the clinic on October 2, 1956, for examination and Dr. Daglis diagnosed his primary problem as that of jaundice. He was treated for a period of twenty days and discharged. During this period he executed the deed to the olive grove estimated to be worth a million drachmas for a stated consideration of 80,000 drachmas.

Mr. Comatsos continued to visit Dr. Daglis complaining of insomnia and fear. On July 8, 1957, again accompanied by his wife, Nina, Mr. Comatsos came to the clinic in bad shape, very irritable and concerned about his health. Dr. Daglis determined that his disorders were the result of psychological factors. He called in a consulting physician and determined that Mr. Comatsos sustained a complete breakdown of his nervous system and a weakness of his freedom of choice because of the lack of understanding between him and his wife; they made certain suggestions to her which she refused to abide by.

Mr. Comatsos left the clinic after eleven days but returned again on September 24, 1957, accompanied by his wife but in a much worse condition psychologically and so much worse that Dr. Daglis was unwilling to assume

the treatment of him. Mr. Comatsos stated to Dr. Daglis that he was living a life of tyranny and that he could not understand the conduct of his wife since he, Comatsos, would always conform to her wishes. Dr. Daglis suggested that they both should go to Athens, Greece, for psychiatric examination and treatment.

On October 17, 1957, Mr. Comatsos executed a deed or bill of sale before the same two Notaries Public, Antonakes and Samarides, in which he sold the Madison Avenue property in Memphis, Tennessee, to his wife for a stated consideration of 90,000 drachmas (approximately $3,300) and the Latham Street property for 60,000 drachmas (approximately $2,200). On November 23, 1957, before these same Notaries he executed a written revocation of his American or Bearman will and also executed the Greek will leaving all of his property to his wife, Mrs. Comatsos.

It was during the treatment of Mr. Comatsos in September, 1957, that Mrs. Comatsos became enraged at Dr. Daglis and caused a great disturbance in his clinic throwing medical instruments across the room, breaking windows of his office and later taking a rock and breaking the windshield of his automobile. She also accused Dr. Daglis of stealing $40,000 from Mr. Comatsos. Dr. Daglis had Mrs. Comatsos arrested and she was ultimately convicted and sentenced to fifteen days in jail for her acts of malicious mischief.

In February, 1958, Mr. Comatsos called Dr. Daglis by telephone from Athens, Greece, demanding that he return the $40,000 which allegedly Dr. Daglis had taken from him saying, "I'll come to Mytilene myself and settle the thing with a gun." Within a matter of ten

minutes Mr. Comatsos called Dr. Daglis again from Athens and stated that all the things he had said before he had been forced to say by his wife and that he would return to Mytilene and give further explanations. Sometime later he returned to Mytilene, Greece, and went to the office of his longtime friend, Papanicolas, a Notary Public and attorney who had refused to execute the bill of sale for the olive grove, and made affidavit that he had falsely accused Dr. Daglis of the theft of the $40,000 upon the demands of his wife, Nina Comatsos. The deed or bill of sale executed by Mr. Comatsos on October 17, 1957, in which he purported to sell to Mrs. Comatsos the two parcels of commercial property located in Memphis, Tennessee, for a consideration of approximately $5,000 were never presented for registration probably because they were not properly acknowledged.

At any rate, on July 1, 1958, Mr. Comatsos executed a deed conveying to Mrs. Comatsos the Madison Avenue property at a stated consideration of $49,900 and he also executed a deed to her to the Latham Street property at a stated consideration of $9,900. These deeds were acknowledged by Mr. Comatsos on July 22, 1958, before Mr. Dudley Cyphers, Vice-Consul of the United States of America at Athens, Greece. These deeds were later recorded in the Register's office of Shelby County, Tennessee, after the death of Mr. Comatsos.

On July 10, 1962, in Mytilene, Greece, the two Notaries Public, Antonakes and Samarides, were charged with violating their duties of office and in preparing contracts for Mr. Comatsos to sign while he was not mentally capable of so doing. Among the witnesses for the defendants upon this hearing were Dr. Katsanes, aged 45, Doctor of Neurology. He examined Mr. Comatsos when

he was in the Daglis clinic and verified the neurotic conditions. Later he examined Mr. Comatsos at his own clinic and recommended to Mrs. Comatsos that he take certain psychotherapy but Mr. Comatsos never did come back for the treatment. Mr. Comatsos gave the impression to Dr. Katsanes that he was a weak character and it could be understood that he was dragged about by his wife. As soon as Mrs. Comatsos said, "Let's go," he followed her. Dr. Katsanes testified that in his opinion the Notaries Public could not have checked the condition of Mr. Comatsos under the circumstances because they were not psychiatrists. He stated that Mr. Comatsos' wife could have been influential for a certain period; she was violent and her character and her personality were more forceful than her husband's who seemed like a man without much of a will.

Mr. Papanicolas, the attorney, Notary Public and long-time friend of Mr. Comatsos, testified as a witness for the Notaries Public that when Mr. and Mrs. Comatsos came to his office to get a sales contract for the olive grove he refused to draw it because he had heard that Comatsos was living a martyr's life with his wife; that Mrs. Comatsos insisted that he make the sales contract in a hurry and that while Mrs. Comatsos was out of the room or out of the presence of Mr. Comatsos he said to Mr. Papanicolas, "Don't do it." When Mr. Papanicolas refused to write the contract Mrs. Comatsos grabbed Mr. Comatsos saying, "You will make it and you will see," and he Papanicolas, told them to leave his office.

Mr. Papanicolas gave as his opinion that Mr. Comatsos was void of a free will and afraid to speak in front of his wife though he understood the nature of the transactions; he stated that in his opinion the Notaries Public

could not have known about Mr. Comatsos' mental disturbances because Mr. Comatsos was afraid to speak in the presence of his wife. In September Mr. Papanicolas saw Comatsos in his car alone in front of the Paritse Clinic where the business of Nina Comatsos' brothers are. Mr. Comatsos turned to Mr. Papanicolas and said, "Save me; save me." He looked like he was insane. Papanicolas lost his composure and left because Nina was nearby as well as her brothers and he did not want to get involved and that in his opinion Mr. Comatsos was completely ruled by fear of his wife.

Dr. Daglis testified as a witness for the Notaries Public that he treated Mr. Comatsos; that he suffered from arteriosclerosis, jaundice and neurosis; that Mr. Comatsos suffered from insomnia, phobia and was unstable; that he knew all about the awful life which he led with his wife and that Comatsos informed him his wife was doing nothing else but trying to grab all of his property; however, Comatsos would often change and could easily mislead people and that he was under the complete domination of his wife; that she had complete hypnotic power over him.

Another witness for the Notaries Public was Paraskevas P. Comatsos, aged 35, a doctor and nephew of Mr. Comatsos, who testified that when his uncle, John Comatsos, was at the Daglis Clinic he begged him to get another nephew and try to take him to Athens and then on back to America without his wife knowing about it, but it wasn't long before he changed his mind and said he would stay with his wife. The Notaries Public were acquitted.

Mr. Anthony George Voyadjis, a retired lawyer of Mytilene, Greece, and boyhood friend of John Comatsos;

the one who represented him as his attorney in Greece and who was named as one of the trustees of the funds to be administered for the poor in Mytilene, Greece, under the American will, testified at length as to the fear under which John Comatsos lived during his last visit to Greece. Mr. Voyadjis had refused to execute the contract for the sale of the olive grove and it was later drawn up by other Notaries Public. He testified that Mr. Comatsos came back to him stating that his wife had made him sign the bill of sale and he wanted to have it invalidated. Mr. Voyadjis agreed to file suit but Mr. Comatsos never did come back alone. Each time he came to his office his wife was with him.

Mr. Voyadjis testified that in the summer of 1957 Mr. Comatsos came to his office and told him about the miserable life that he was leading; and how he had been mistreated. Mr. Comatsos even said that Mrs. Comatsos had thrown benzene, an inflammable fluid, on his clothing and threatened to touch a lighted match to him. On cross-examination Mrs. Comatsos begged the question somewhat when asked about the incident in which Mr. Comatsos stated that she had put benzene on him. She stated that she might have put benzene on his clothes for cleaning purposes; that she might have stood up over him with a match to light his cigar but insisted she never threatened to apply the match to the benzene in his clothes.

Mr. Voyadjis said that Mrs. Comatsos followed Mr. Comatsos into the private office, started screaming and cursing until he had to call the police to take her away. Further he testified that a brother of Mrs. Comatsos appeared on the scene and stated that the parties ought to get a divorce. At this time Mr. Comatsos rose up and replied, "I give no divorce now that you have taken all

of my property. How will I live?'' Mr. Voyadjis testified that Mrs. Comatsos exercised complete dominion over Mr. Comatsos and that he deteriorated both physically and mentally under her domination and mistreatment. A son of Mr. Voyadjis, also a practicing lawyer in Greece, corroborated the testimony of his father and took the leading part in the prosecution of the Notaries Public for breach of duty in preparing the deeds of Mr. Comatsos to Mrs. Comatsos.

. Mr. Cyphers, the Vice-Consul in Greece who took the acknowledgement of Mr. Comatsos to the deeds which are under attack in this litigation, also testified by deposition. After his office received the letter from Mr. Bearman requesting an investigation of the alleged mistreatment of Mr. Comatsos by Mrs. Comatsos an independent investigation was made by representatives of his office which report showed that Mrs. Comatsos was in fact mistreating her husband and making life miserable for him.

. He called Mr. Comatsos to his office and interrogated him about the mistreatment. Mr. Comatsos confirmed the mistreatment but stated, in substance, that he intended to live with his wife and did not want any action taken. Each time Mrs. Comatsos accompanied Mr. Comatsos to the interview by Mr. Cyphers and she readily admitted in front of Mr. Comatsos that she had married him for his money. At the time of the acknowledgements Mrs. Comatsos, of course, was present with him. However, Mr. Comatsos separately and apart from his wife acknowledged that he signed the deeds freely and voluntarily and that even though he had been mistreated by his wife and lived a miserable life he intended to continue to live with her and that they intended to come back to

America together. Mr. Cyphers did not know anything about the mental breakdown of Mr. Comatsos or that he had been treated by psychiatrists.

In addition to the testimony of Mrs. Comatsos there were several witnesses who testified in support of her contention that Mr. Comatsos was of sound mind and completely uncoerced at the time he signed the two deeds involved in this litigation. Dr. Karamanos, a physician aged 71, testified that Mr. Comatsos was a perfect physiological man. He had been Nina Comatsos' physician from her childhood. To his best recollection Mr. Comatsos always came to his office alone.

Mr. Katsadramos, the Director of the Department of Correction in Mytilene, Greece, testified that he knew Mr. Comatsos one year before his death; that he investigated the alleged theft of $40,000 from Mr. Comatsos in the office of Dr. Daglis and that Mr. Comatsos told him that nothing like that occurred and that Mr. Comatsos made no complaint of mistreatment by his wife. He seemed to be a well balanced man but worried about the case of his wife and Dr. Daglis.

Dr. Hiotellis, physician aged 46, a pathologist having studied at the University of Athens, testified that he often examined and treated John Comatsos; that he saw him on the 30th of July, 1956, when he was complaining of insomnia and that he diagnosed him as having hypertension arteriosclerosis and nervous disorder; that he saw him on August 13, 1956, August 16, 1956, and August 22, 1956; that he also treated him on September 12, 1956, at the clinic of Dr. Daglis where he had been called in consultation; that he saw him in July, 1957, and September, 1957, and then was called to his home on September

27, 1958, when he had had a brain hemorrhage; that in his opinion the nervous disorders of Mr. Comatsos did not affect his nervous system at all and that he was a perfectly logical man and that his answers were always accountable and clear.

Lay witnesses including relatives and close friends of Mrs. Comatsos testified that Mr. and Mrs. Comatsos got along very well together; that there was no mistreatment; that Mr. Comatsos seemed to be very fond of Mrs. Comatsos and she of him, etc.

■ We have not discussed all of the witnesses who testified in the case. More than one witness testified that he actually saw Mrs. Comatsos strike Mr. Comatsos. Theodore Epaminondas Francos, olive merchant who rented the olive grove, testified that on one occasion Mr. Comatsos seemed to be trembling very much in fear and asked Mr. Francos to assist him to the doctor's office. Suffice it to say the evidence in behalf of the appellant, Mrs. Comatsos, does not preponderate against the finding of the Trial Court that at the time Mr. Comatsos signed the two deeds in litigation in this cause on July 1, 1958, he was mentally and physically ill and that she coerced him into signing the deeds and acknowledging them before the Vice-Consul and that said deeds were procured by the undue influence of Mrs. Comatsos over her husband without any valid consideration and that said deeds were not the free acts and deeds of Mr. Comatsos.

The action of the Chancellor in setting aside said deeds and divesting title out of Mrs. Comatsos will be affirmed. The assignments of error relating thereto will be respectfully overruled. The cause will be remanded for enforcement of the Chancellor's decree.

· The monthly payments which Mrs. Comatsos has been receiving from the funds in the Registry of the Court representing one-third of the net rentals from the commercial property will cease upon the date of the announcement of this opinion. The costs of this appeal will be taxed three-fourths to Mrs. Comatsos and one-fourth to the complainants. T.C.A. Section 20-1621.

· Puryear, J., of the Middle Section sat on this case by interchange with Avery, who recused himself.

Puryear and Bejach, JJ., concur.

OPINION DENYING PETITION TO REHEAR

CARNEY, J. On April 22, 1966, this Court announced an opinion affirming the decree of the lower Court. The appellant, Mrs. Nina Comatsos, has filed a petition to rehear.

The appellant insists that this Court failed to consider her contention that the deeds in question were acknowledged by Mr. Comatsos on July 1, 1958, before Mr. Cyphers, the American Consul in Greece, and that they were reaffirmed by Mr. Comatsos before Mr. Cyphers on July 22, 1958, and hence became validated under the authority of Hinton v. Robinson (1963) 52 Tenn.App. 1, 364 S.W.2d 97. This contention was made in the brief filed by appellant before this Court and considered by us. However, we made no mention of it in our opinion. Hinton v. Robinson involved the validity of a deed executed by an elderly woman after she had been adjudged to be mentally incompetent. Shortly after she executed the deed the Court decree adjudging her to be mentally incompetent was vacated because of lack of personal service. This Court, speaking through Judge Humphreys, held that it was unnecessary to determine whether Mrs.

Potts was mentally incompetent at the time she executed the deed because the evidence showed affirmatively that she subsequently ratified and confirmed the former deed with full knowledge of its provisions and of the legal effect of said deed.

Mr. Comatsos executed separate deeds to the two parcels of real estate located in Memphis, Tennessee. The deeds were each dated July 1, 1958, and bore an acknowledgment before Mr. Cyphers of date July 1, 1958. Each of these deeds recited a consideration of $10.00 cash in hand paid and other good and valuable consideration. These two deeds were recorded in the Register's office of Shelby County, Tennessee, after Mr. Comatsos died. We were in error in our former opinion when we stated that these deeds were acknowledged on July 22, 1958.

Also introduced in the record were two documents entitled "Real Estate Sales Contract" each dated July 1, 1958. In one document Mr. Comatsos contracted to sell to Mrs. Comatsos the property located on Madison Avenue in Memphis, Tennessee, at a price of $49,990. In the other real estate contract he contracted to sell the property located on Latham Street to Mrs. Comatsos for $9,990. These two real estate contracts were acknowledged on July 22, 1958, by Mr. and Mrs. Comatsos before Mr. Cyphers but they were never recorded in the Register's office of Shelby County, Tennessee. The rule of ratification as expressed in Hinton v. Robinson, supra, does not apply in the case at bar. Mr. Comatsos was 69 years of age and debilitated both in mind and body on July 1, 1958. The same mental domination and control which Mrs. Comatsos held over Mr. Comatsos on July 1, 1958, continued on through July 22, 1958. Therefore, the first

316

ground of the petition to rehear is respectfully overruled.

The second ground of the petition to rehear is that the Court incorrectly applied T.C.A. Section 27-303 which provides for an appeal de novo by this Court with a presumption of correctness of the decree of the lower Court. Appellant cites in support of this ground the case of Town of Alamo v. Forcum-James, 205 Tenn. 478, 327 S.W.2d 47. We have reread Town of Alamo v. Forcum-James and fail to see its applicability. In Alamo v. Forcum-James the appellant insisted that the Court of Appeals should not have reviewed the case de novo with a presumption of correctness under T.C.A. Section 27-303 but should have reviewed the case as a jury case and affirmed the Chancellor if there was any material evidence to support the decree below. The Supreme Court held that the Court of Appeals properly applied T.C.A. Section 27-303 which carried only a presumption of the correctness of the decree of the Court below. We applied the same rule to the case at bar and we think properly so. Therefore, the second ground of the petition to rehear is respectfully overruled and the petition to rehear denied.

Solicitor for appellant has also filed by separate document of date May 10, 1966, a motion requesting the Court to permit her to continue receiving one-third of the net monthly rentals pending the final disposition of this cause. In our opinion announced April 22, 1966, we ordered these payments discontinued as of that date. Since we have denied the petition to rehear as above set out, we think our order discontinuing payment of one-third of the monthly rentals should stand. The motion to allow the continuance of the monthly payments will also be denied.

 Solicitors for appellees have filed of date May 12, 1966, a motion to require Mrs. Comatsos to pay rent at the rate of $75.00 per month for the further occupancy of the apartment at 1524-26 Latham Street, Memphis, Tennessee, or in the alternative to vacate said premises immediately. They have asked for an immediate writ of possession and procedendo to the lower court. Even though this court has rendered judgment adverse to the interests of Mrs. Comatsos and has denied her petition to rehear, she has the legal right to petition the Supreme Court of Tennessee for writ of certiorari. While we have denied her motion for the continuance of the payment of one-third of monthly rentals, we think it inequitable to require her to vacate the premises and find another place to live pending action by the Supreme Court on her petition for certiorari. Accordingly, the motion of the appellees will be denied. Our opinion of date April 22, 1966, and the decree entered thereon will be modified so as to provide that Mrs. Comatsos may continue occupancy of the apartment at 1524-26 Latham Street, Memphis, Tennessee, until final action by the Tennessee Supreme Court on her petition for certiorari or until the time shall have expired within which she may legally file a petition for certiorari. She will be charged in the final settlement of the estate at the rate of $75.00 per month for occupancy as provided by decree of the lower court. The costs of the petition to rehear, the petition to continue monthly payments and the petition for writ of possession will be taxed one-half to Mrs. Comatsos and one-half to the appellees.

Judge William P. Puryear of the Middle Section of this Court, who sat by interchange in the place of Presiding Judge Avery, has concurred in all of this

opinion except the last paragraph relating to the writ of possession. By written consent, argument on the petition for the writ of possession was heard on May 26, 1966, before Judges Carney and Bejach. Judge Bejach concurs in this entire opinion.

Bejach and Puryear, JJ., concur.